IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Joseph Leta, Sr., *et al.*, | : | |
| | : | Case No. 1:22-cv-511 |
| Plaintiffs, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | Order Granting Motions to Dismiss and |
| Hamilton County Department of Job & | : | Denying as Moot Joint Motion for |
| Family Services, *et al.*, | : | Protective Order |
| | : | |
| Defendants. | : | |

Plaintiffs Joseph Leta, Sr., Nicole Leta, and Sherriden Weil filed suit against thirteen

different governmental and non-governmental entities and individuals asserting violations of

their constitutional rights after their children were vaccinated without their consent while in

temporary foster case. Pending before the Court are (1) the Motions to Dismiss filed separately

by the Hamilton County Defendants,[1] Defendant Necco, LLC, the TriHealth Defendants,[2] and

Defendant Cheryl Sakhi (Docs. 11–14) and (2) Defendants' Joint Motion for Protective Order

Staying Discovery (Doc. 25). All thirteen Defendants argue that Plaintiffs have failed to state a

claim upon which relief can be granted, and the non-governmental Defendants argue that they

cannot be held liable as state actors for violating constitutional rights. Additionally, Defendants

move to stay all discovery until the Motions to Dismiss are adjudicated.

For the reasons that follow, the Court **GRANT** the Motions to Dismiss and **DENY AS**

**MOOT** the Joint Motion for Protective Order.

---

[1] The Hamilton County Defendants are the Hamilton County Board of Commissioners, Hamilton County Job and Family Services, Sandi Webster, Samantha Fleckenstein, and Bailee Brown. (Doc. 11 at PageID 49.)

[2] The TriHealth Defendants are TriHealth, Inc., Bethesda Family Practice Center, Constance Zimmer, Lorraine Stephens, M.D., Kaitlyn Steffenmeier, M.D., and Richard Okragly, Jr., M.D. (Doc. 13 at PageID 85.)

## I. BACKGROUND

### A. Factual Allegations

The factual allegations in the First Amended Complaint are taken as true for purposes of the Rule 12(b)(6) motions.

#### 1. Leta Children Placed in Foster Care

Plaintiffs Joseph Leta and Nicole Leta ("the Letas" or "the parents") are the married parents of five children referred to as JL1, NL1, AL, NL2, and JL2 ("the Leta children"). (Doc. 7 at PageID 30, 33.) Plaintiff Sherriden Weil is the maternal grandmother of the Leta children. (*Id.* at PageID 31.)

On January 10, 2020, JL2 (age 3) woke up from a nap and snuck out of the family's house while Nicole Leta and the other Leta children were in other rooms. (*Id.* at PageID 33.) A neighbor reported JL2's "escape" to the Delhi Township, Ohio police, who reported the situation to Defendant Hamilton County Job and Family Services ("JFS"). (*Id.*) The Hamilton County, Ohio Juvenile Court subsequently removed the Leta children from their home and placed them in the interim custody of JFS. (*Id.*) JFS then assigned the children to multiple foster homes. (*Id.*)[3] Three Leta boys—JL, AL, and JL2—were living with Defendant Cheryl Sakhi, a foster caregiver with Defendant Necco, a foster care agency with whom JFS contracted, by March 2020. (*Id.* at PageID 34.)

#### 2. Police Called When Letas and Weil Attend Their Children's Medical Appointment

On September 2, 2020, Defendant Bailee Brown, the JFS caseworker assigned to the Leta family in their Juvenile Court case, informed Joseph Leta that his sons were scheduled for

---

[3] The allegation that the Letas retained rights regarding their children's medical care when they were placed in foster care, including the right to consent to medical vaccinations, is a legal conclusion at the heart of this case that the Court need not accept as true. (*Id.* at PageID 33–34.)

medical appointments the next day at Defendant Bethesda Family Practice Center ("BFPC"), and the parents could attend.  (*Id.*)  BFPC is a medical practice owned and operated by Defendant TriHealth, Inc.  (*Id.* at PageID 32.)  Foster caregiver Sakhi called BFPC and warned the staff there could "be trouble" if the parents attended the appointments.  (*Id.* at PageID 34.)  The Letas had never spoken to Sakhi previously.  (*Id.*)

The Letas and Weil introduced themselves at the front desk of the BFPC medical office when they arrived the next day.  (*Id.*)  Joseph Leta asked who would be permitted with the children in the exam room given the COVID-19 protocols in effect.  (*Id.* at PageID 35.)  When told only two adults would be permitted, Joseph Leta suggested that it be Nicole Leta and Sakhi.  (*Id.*)  Sakhi then arrived with the three Leta boys and her own 18-year-old daughter.  (*Id.*)  Sakhi's daughter was holding JL2.  (*Id.*)  JL2 reached out to his mother, and Nicole Leta reached out to take him from the teenager.  The teenager pulled away and twice told Nicole Leta not to touch her.  (*Id.*)  Any physical contact between Nicole Leta and Sakhi's daughter was unintended and incidental to Nicole Leta taking hold of her son.  (*Id.*)  Sensing there would be trouble about who was permitted in the exam room, Joseph Leta stepped outside to call his attorney, JFS caseworker Brown, and others.  He was unable to reach any person for help.  (*Id.*)  When the Leta children were called into the exam room, only foster caregiver Sakhi and her daughter were permitted to accompany them.  (*Id.* at PageID 36.)  A staff member stopped Nicole Leta from following and said that Nicole Leta needed to sign a form.  (*Id.*)

Several minutes later, City of Norwood, Ohio police officers arrived at the BFPC medical office and told the Letas and Weil that they had to leave the building.  (*Id.*)  JFS caseworker Brown later admitted that she directed "TriHealth/BFPC/[Defendant Constance ]Zimmer" to call the police to remove the Letas.  (*Id.* at PageID 36.)  Zimmer was the practice manager at BFPC.

The police were called at JFS's direction even though no police intervention was needed. (*Id.*) The Letas and Weil were sitting silently in the waiting room when the police arrived. (*Id.*) The Letas and Weil cooperated when the police officer escorted them out of the building. (*Id.*) Foster caregiver Sakhi was in contact with foster agency Necco seeking direction and support during this time. (*Id.* at PageID 37.) Sakhi spoke bluntly and critically about the Letas for eight minutes in front of the Leta children. (*Id.*)

### 3. Leta Children Vaccinated Without Parental Consent

During the medical visit on September 3, 2020, two Leta children, AL and JL2, were given several vaccinations without the Letas' consent. (*Id.*) Plaintiffs allege that TriHealth, BFPC, and three physicians with BFPC—Drs. Lorraine Stephens, Kaitlyn Steffensmeier, and Richard Okragly—"individually and jointly, all in joint participation and coordination with" JFS, JFS caseworker Brown and/or JFS section chief Sandi Webster, and foster caregiver Sakhi made the decision to give the vaccines to AL and JL2. (*Id.*)

The Letas submitted an inquiry to JFS about how the vaccinations occurred. They allege the vaccinations had been against their "rights, wishes, and religious beliefs." (*Id.* at PageID 38.) Webster responded in a letter in part as follows: "Our agency attorney indicated your objection to getting your children's vaccination has been heard and ruled upon by the Juvenile Court." (*Id.*) In fact, the Juvenile Court had not ruled on that issue, and the Letas allege that Webster deliberately lied. (*Id.*)[4] "Parents strongly suspect that Defendants JFS, Webster, and/or Brown played a direct role in authorizing vaccinations against Parents' consent, but discovery will be required to determined what occurred in the TriHealth/BFPC/Zimmer evasive, administrative

---

[4] At the oral argument hearing, counsel for Hamilton County asserted that the Juvenile Court had adjudicated JFS's authority to have the Leta children vaccinated over the Letas' objection in a prior custody case. That asserted fact, however, is contrary to the well-pleaded allegations in the Amended Complaint and is not relied upon for purposes of the pending Motions.

mess, and who directed the decision-making that day." (*Id.* at PageID 39.)

Medical records from the BFPC indicate three facts about who gave consent for the vaccinations:

> (1) there was no indication of consent for vaccination in the September 3, 2020 records;
>
> (2) Foster caregiver Sakhi informed the BFPC treating physician on March 12, 2020 that Nicole Leta *did not* consent to vaccinations; and
>
> (3) Sakhi, acting on behalf of foster agency Necco, gave her written consent for treatment, including vaccinations on March 12, 2020.

(*Id.* at PageID 37–39.)[5]

## B.     Procedural History

The Letas and Weil initiated this action on September 2, 2022, and then they filed a First Amended Complaint on October 31, 2022. (Docs. 1, 7.) Plaintiffs allege four claims against the Hamilton County Defendants, the TriHealth Defendants, the foster agency Necco, and the foster caregiver Sakhi collectively:

> (1) Denial of parental rights to access to children's medical care as protected by the Due Process Clause;
>
> (2) Denial of parental rights to control children's medical care as protected by Due Process Clause;

---

[5] Plaintiffs make several allegations about their efforts to obtain more information or pre-suit discovery about the events that occurred at the medical offices on September 3, 2020. Plaintiffs assert generally that Defendants were not cooperative and would not produce documents without a warrant. These alleged facts are not spelled out here because they are not relevant to the merits of the pending motions.

The Court notes that Plaintiffs suggest that their claims should be permitted to go forward, even when based only on mere speculation, because Defendants were not cooperative in pre-suit discovery efforts. However, a plaintiff must allege facts sufficient to state a plausible claim even when he alleges the necessary facts are "within the head or hands of the defendants." *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011). "The plaintiff may not use the discovery process to obtain [necessary] facts after filing suit." *Id.*; *see also Anderson v. Bos. Sci. Corp.*, No. 1:12-CV-00762, 2013 WL 632379, at *3 (S.D. Ohio Feb. 20, 2013) ("[D]iscovery cannot be used as a fishing expedition to uncover the facts necessary to support the causes of action presented in the complaint."). Moreover, discovery as to which individual Defendants took particular actions is not necessary here because, as stated in the Analysis section, Plaintiffs have failed to plead a violation of their clearly established constitutional rights.

(3) Violation of parental rights to religious freedom as protected by the First and Fourteenth Amendments; and

(4) Unreasonable seizure in violation of the Fourth Amendment.

(Doc. 7 at PageID 42–43.)  Because the Plaintiffs allege a violation of parental rights in the first three claims, the Court assumes that the first three claims are brought on behalf of the Letas only. The Letas and Weil seek money damages for the alleged constitutional violations under 42 U.S.C. § 1983.

All Defendants moved for dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and for a protective order to stay discovery pending adjudication of the Motions to Dismiss.  Plaintiffs opposed all of Defendants' Motions, which are now fully briefed and ripe for adjudication.  The Court held oral arguments on March 20, 2023.  At that hearing, Plaintiffs moved for the first time to admit the Norwood police officers' bodycam footage into evidence for purposes of the Motions to Dismiss.  Defendants opposed that oral motion and requested the right to supplement the dismissal briefing if the footage is admitted.  The Court will deny the motion to admit the bodycam footage as unnecessary and untimely.[6]

## II.    STANDARDS GOVERNING MOTIONS TO DISMISS

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To withstand a motion to dismiss, a complaint must comply with Federal Rule of Civil Procedure 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled

---

[6]  Plaintiffs did not submit the bodycam footage when they filed the Amended Complaint.  Instead, they chose to describe what the bodycam footage showed in their allegations.  (Doc. 7 at PageID 36–37.)  Defendants based their arguments in the Motions to Dismiss on those written allegations.  In their Memoranda in Opposition, Plaintiffs also relied on the allegations pleaded in the Amended Complaint and did not seek to admit the bodycam footage. Defendants filed their Reply briefs again based solely on the written allegations.  It would be unfair and contrary to judicial economy to admit the bodycam footage and permit additional briefing at this late date.  Moreover, counsel for Plaintiffs did not identify any new, material, or dispositive facts which would be gleaned from the bodycam footage that it had failed to include in the Amended Complaint.  For these reasons, the Court will deny the oral motion to admit the police bodycam footage.

to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–678 (2009) (quoting Rule 8(a)).

A complaint must include sufficient facts to state a claim that is plausible on its face and not speculative. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Mere "labels and conclusions [or] a formulaic recitation of the elements of a cause of action" will not suffice. *Twombly*, 550 U.S. at 555. A complaint must contain "either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *DiGeronimo Aggregates, LLC v. Zemla*, 763 F.3d 506, 509 (6th Cir. 2014) (citation omitted). However, it "does not need detailed factual allegations" or "heightened fact pleading of specifics." *Twombly*, 550 U.S. at 555, 570. A district court examining the sufficiency of a complaint must accept well-pleaded facts as true, but not legal conclusions or legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678–679; *DiGeronimo Aggregates*, 763 F.3d at 509.

## III.    ANALYSIS

The Letas and Weil purport to assert constitutional claims against all Defendants pursuant to 42 U.S.C. § 1983. Section 1983 provides a cause of action against any person who, acting under the color of state law, violates the constitutional rights of another.[7] The Letas allege generally that Defendants violated their due process rights by denying them access to and control

---

[7] The statute states as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

of their children's medical care when their children were taken into the medical exam room without them and administered vaccines without their consent. They also allege that Defendants' administration of the vaccines to their children violated their religious beliefs. Finally, the Letas and Weil allege that Defendants are liable for violating their Fourth Amendment rights because they were seized by the Norwood police officers when they were removed from the BFPC medical office.

Defendants move to dismiss the Letas' and Weil's claims on the basis that Plaintiffs fail to state a claim for a violation of their constitutional rights. The individual Defendants sued in their personal capacities also argue that they are entitled to qualified immunity.[8] Finally, the TriHealth Defendants, Sakhi, and Necco move to dismiss on the grounds that they are not governmental actors, and their actions were not taken under the color of state law for purposes of § 1983 liability.

The doctrine of qualified immunity provides "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity provides immunity from suit, not simply a defense to liability. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To determine whether qualified immunity applies, courts

---

[8] Plaintiffs do not specify in the First Amended Complaint whether they are suing the individual Defendants in their official capacities, individual capacities, or both. "Suing a public official in his official capacity for acts performed within the scope of his authority is equivalent to suing the governmental entity." *Soper v. Hoben,* 195 F.3d 845, 853 (6th Cir. 1999) (citing *Ky. v. Graham,* 473 U.S. 159, 166 (1985)). "Generally, plaintiffs must designate in which capacity they are suing defendants; if not, by operation of law, defendants are deemed sued in their official capacities." *Id.* Nonetheless, because the individual Defendants raised arguments on dismissal as if they were sued in both capacities, the Court will make that assumption as well.

Although qualified immunity is an affirmative defense, dismissal on the basis of qualified immunity is appropriate when "the validity of such defense [is] apparent from the face of the complaint." *Crawford v. Tilley*, 15 F.4th 752, 763 (6th Cir. 2021).

must ask whether the government official's conduct violated a constitutional right, and if yes, whether the specific right violated was clearly established. *Saucier v. Katz*, 533 U.S. 194, 200–201 (2001). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson*, 555 U.S. at 232. A defendant is entitled to qualified immunity if his conduct violated a constitutional right, but that right was not clearly established at the time of the violation. *Saucier*, 533 U.S. at 200–201. The inquiry into whether the constitutional right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. Courts can examine either issue first. *Pearson*, 555 U.S. at 236.

### A.    Claims for Violation of Parents' Rights to Access and Control Children's Medical Care

#### 1.    Overview of the Legal Issue

The Letas allege that Defendants denied them the rights of access to and control of their children's medical care in violation of the Due Process Clause of the Constitution. (Doc. 7 at PageID 42.) "The Supreme Court has called parents' 'care, custody, and control of their children . . . perhaps the oldest of the fundamental liberty interests recognized by this Court.'" *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 762 (6th Cir. 2020) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion)). This includes a fundamental due process right "to direct the medical care of their children[,]" though "case law in this area is sparse." *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 415, 419 (6th Cir. 2019).

Parental rights are not absolute, however. "[I]f parental control falters, the State must play its part as *parens patriae*." *Schall v. Martin*, 467 U.S. 253, 265 (1984). "[L]imitations on parents' control over their children are particularly salient in the context of medical treatment." *Kanuszewski*, 927 F.3d at 419. "[A] state is not without constitutional control over parental

9

discretion in dealing with children when their physical or mental health is jeopardized." *Parham v. J. R.*, 442 U.S. 584, 603 (1979). In fact, the Sixth Circuit stated in 2017 that parents had no constitutional right to an exemption from Michigan's mandatory vaccination program for children. *Nikolao v. Lyon*, 875 F.3d 310, 316 (6th Cir. 2017) (contrasting the lack of constitutional right to an exemption with the fact that Michigan provides a statutory right). Plaintiffs do not point to any caselaw calling that *Nikolao* holding into doubt prior to September 2020.[9]

Ohio regulations require public children services agencies to coordinate comprehensive health care for the children in their care, including appropriate immunizations:

> (A) The public children services agency (PCSA) or private child placing agency (PCPA) *shall coordinate comprehensive health care for each child in its care or custody* who enters into substitute care or has a placement change. In coordinating comprehensive health care, the PCSA or PCPA shall attempt to arrange for health care from the child's existing and previous medical providers as well *as involve the parent, guardian, or custodian in the planning and delivery of health care services*.
>
> * * *
>
> (D) The PCSA or PCPA shall arrange for the following health care pursuant to rule 5160-1-14 of the Administrative Code and the "Bright Futures" guidelines (rev. 2/2017) for a child who is in substitute care. The guidelines can be reviewed at http://brightfutures.aap.org. *The agency shall ensure:*
>
> * * *
>
> > *(5) Every child entering substitute care receives immunizations appropriate to age and health history.*

Ohio Admin. Code 5101:2-42-66.1 (emphasis added).[10]

---

[9] The Court notes that COVID-19 vaccines had not been approved or administered as of September 2020 in the United States. The caselaw that developed on mandatory COVID-19 vaccinations is not relevant to this discussion.

[10] Additionally, Ohio law generally requires a course of vaccinations for school-age children. Ohio Rev. Code § 3313.671(A)(1). There is an exception for a student whose parent or guardian "declines to have the pupil immunized for reasons of conscience, including religious convictions." Ohio Rev. Code § 3313.671(B)(4). The Letas contend that this exception is applicable here, but they failed to allege that Defendants knew they had a

Plaintiffs cite the case of *Santosky v. Kramer*, 455 U.S. 745 (1982), for the principle that parental rights "do[ ] not evaporate simply because [the parents] have not been model parents or have lost temporary custody of their child to the State." *Id.* at 753. That quotation arises, however, in a discussion of the need for procedural due process protections for parents before the final forced dissolution of their parental rights. *Id.* It does not stand for the proposition that parents who have lost temporary custody of their children retain an unfettered constitutional right to direct their children's medical care.

Plaintiffs' attorney conceded that he could not identify any authority holding that parents who have lost temporary custody of their children retain a substantive due process right to access and control their children's medical decisions, including the right to decline vaccinations. In the absence of such clearly established authority, individual Defendants are entitled to qualified immunity on these claims.

### 2. Defendants Are Not Liable

In addition to the fact that individual Defendants are entitled to qualified immunity, the parental right to access and control medical care claims fail on other independent bases.

### a. Hamilton County Defendants

None of the Hamilton County Defendants—the Hamilton County Board of Commissioners, Hamilton County JFS, Sandi Webster, Samantha Fleckenstein, and Bailee Brown—can be held liable. Brown was the JFS caseworker assigned to the Leta family, Fleckenstein was Brown's supervisor, and Webster was the JFS ongoing section chief and the supervisor of both Brown and Fleckenstein. (Doc. 7 at PageID 31, 40.) However, respondeat

---

religious-based objection to vaccinations. In the key allegation, Plaintiffs allege only that foster caregiver Sakhi informed the treating physician in March 2020 that Nicole Leta did not consent to vaccinations. (Doc. 7 at PageID 39.) They do not specifically allege that Defendants knew their objection to vaccinations was based on a particular religious belief. In fact, Plaintiffs allege neither the nature of their religious beliefs nor how the vaccination of children conflicts with those beliefs.

superior is not available as a theory of recovery under § 1983. *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 691 (1978). Each defendant's liability or a constitutional violation under § 1983 must be assessed individually, based on his or her own actions. *Dorsey v. Barber,* 517 F.3d 389, 399 n. 4 (6th Cir. 2008). A supervisor is liable only if she encouraged, participated in, authorized, approved, or knowingly acquiesced in the unconstitutional conduct of his subordinates. *Petty v. Cnty. of Franklin, Ohio*, 478 F.3d 341, 349 (6th Cir. 2007); *Taylor v. Mich. Dep't of Corrs.*, 69 F.3d 76, 81 (6th Cir. 1995).

A quick review of the facts alleged against Fleckenstein, Webster, and Brown demonstrate that none can be held liable. Plaintiffs allege that Brown informed the Letas that they could attend the children's medical appointments on September 3, 2020. (Doc. 7 at PageID 34.) They also allege that at an unspecified time, Brown gave a "directive to TriHealth/BFPC/Zimmer to call the police to remove Parents." (*Id.* at PageID 36.) Plaintiffs speculate that "Brown did so only with the approval of, or under the direction of, Defendants Fleckenstein and/or Webster." (*Id.* at PageID 41.) Regarding the decision to vaccinate the children, Plaintiffs broadly allege that that Webster and/or Brown "in joint participation and coordination" with the TriHealth Defendants and foster caregiver Sakhi made the decision to administer several vaccines to AL and JL2. (*Id.* at PageID 37–38.)

These facts are not sufficient to state claims against Fleckenstein, Webster, or Brown. Plaintiffs do not allege that any of the JFS employees were present at BFPC on the day of the Leta children's appointments. They do not allege any specific, non-conclusory facts that the JFS employees communicated with the TriHealth Defendants or with foster caregiver Sakhi about vaccinating the children. To be clear, Plaintiffs do not allege that any specific JFS employee directed that the Leta children be vaccinated at the September 3, 2020 medical appointment or

even knew that the Leta children would be vaccinated at that appointment. Instead, Plaintiffs admit that it is "not clear" if the TriHealth Defendants relied on the consent of the foster caregiver to administer the vaccine and they only "strongly suspect Defendants JFS, Webster, and/or Brown played a direct role." (*Id.* at 39.) They conclude that "discovery will be required to determine what occurred" and "who directed the decision-making [sic] that day." (*Id.*) These allegations are not "enough to raise a right to relief" against Fleckenstein, Webster, or Brown "above the speculative level." *Twombly*, 550 U.S. at 555.[11]

Likewise, the allegations in the Amended Complaint are not sufficient to state a claim against Hamilton County itself.[12] A county can be "liable under § 1983 only where the [county] itself causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). Respondeat superior is not a sufficient basis for liability. *Monell*, 436 U.S. at 691; *see also Morgan v. Fairfield Cnty., Ohio*, 903 F.3d 553, 565 (6th Cir. 2018) ("[A] municipality is liable only for its own wrongdoing, not the wrongdoings of its employees."). Therefore, plaintiffs seeking to hold a county liable must "identify a [governmental] 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997). The Sixth Circuit has recognized at least four avenues by which a plaintiff can

---

[11] Plaintiffs also want the Court to draw the inference that Brown directed "TriHealth/BFPC/Zimmer" to have the Norwood police remove the Letas from the medical office as part of a conspiracy to exclude the Letas from the medical exam so the children could be vaccinated. "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013). This conspiracy inference is far-fetched. It would have been simpler for caseworker Brown simply not to have informed the Letas about the medical appointment for their children if the goal was to exclude them. Plaintiffs have pleaded no facts to support the inference that Brown or the Hamilton County Defendants knew the children were going to be vaccinated that day. Moreover, it is just as likely from the sparse facts alleged that Brown directed that the TriHealth Defendants call the police because there had been an incident in the waiting room between Nicole Leta and Sakhi's teenage daughter over JL2 that led the teenager to twice tell Nicole Leta, "Don't touch me," and that caused an "unhappy" Sakhi to "approach[ ] the front desk." (*Id.* at PageID 35.)

[12] Though not raised by the Hamilton County Defendants, the Court has previously held that JFS is not *sui juris* and does not have the capacity to be sued. *Lowe v. Hamilton Cnty. Dep't of Job and Family Servs.*, No. No. 1:05cv117, 2008 WL 816669, at *2–3 (S.D. Ohio Mar. 26, 2008).

prove a government's policy or custom:

> (1) the [government's] legislative enactments or official agency policies;
> (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations.

*Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

Plaintiffs here attempt to plead *Monell* liability two ways. First, they allege that JFS caseworkers and supervisors have decisionmaking authority for "day-to-day communications with medical providers." (Doc. 7 at PageID 41.) However, Plaintiffs do not make any non-conclusory allegations that Brown, Fleckenstein, or Webster communicated with the TriHealth Defendant medical providers about vaccinating the Leta children at the September 2020 appointment. Second, Plaintiffs allege that the "conduct of JFS Defendants in this case is consistent with long-standing JFS policies, practices, and customs of undermining parental rights and misleading medical provider and foster caregivers to portray parents in a bad light." (*Id.* at PageID 40.) This allegation also is conclusory. It fails to identify any specific policies or practices of JFS and to explain how the "conduct" of anyone at JFS led to a violation of Plaintiffs' constitutional rights.

### b. TriHealth Defendants, Sakhi, and Necco

The remaining Defendants also cannot be held liable on the due process denial of access to and control of medical care claims. The fundamental problem with these claims against the TriHealth Defendants, the foster parent Sakhi, and the foster agency Necco is that none of them are government actors. Liability under § 1983 is predicated on acts occurring under color of state law. Ordinarily, a private actor can be held liable under § 1983 only if their actions are held to be fairly attributable to the state under the public function test, the state compulsion test, or the

nexus test:

> The public function test "requires that the private entity exercise powers which are traditionally exclusively reserved to the state." [*Wolotsky v. Huhn,* 960 F.2d 1331, 1335 (6th Cir.1992).] The state compulsion test requires proof that the state significantly encouraged or somehow coerced the private party, either overtly or covertly, to take a particular action so that the choice is really that of the state. *Id.* Finally, the nexus test requires a sufficiently close relationship between the state and the private actor so that the action taken may be attributed to the state. *Id.*

*Memphis, Tenn. Area Loc., Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004). These tests boil down to a core question: "whether there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brent v. Wayne Cnty. Dep't of Hum. Servs.*, 901 F.3d 656, 676 (6th Cir. 2018) (cleaned up).

In this case, Plaintiffs argue that the TriHealth Defendants, Sakhi, and Necco can be held liable as state actors under § 1983 because they conspired with or acted in concert with the Hamilton County Defendants to violate Plaintiffs' rights. "Private persons may be held liable under § 1983 if they willfully participate in joint action with state agents." *Memphis, Tenn. Area Loc. Am. Postal Workers Union*, 361 F.3d at 905. Whether or not private actors' conduct was sufficient to transform them into state actors is a question of law for the Court to determine. *Neuens v. City of Columbus*, 303 F.3d 667, 670 (6th Cir. 2002).

The case of *Siefert v. Hamilton Cnty.*, 951 F.3d 753 (6th Cir. 2020), is instructive. In *Siefert*, the Sixth Circuit explained that "non-government actors must comply with constitutional commands" when "there is such a close nexus between the State and the challenged action [by the private entity] that seemingly private behavior may be fairly treated as that of the State itself." *Id.* at 759–760. The plaintiffs in *Siefert* plausibly alleged that a children's hospital could treated as a state actor for purposes of § 1983 when they asserted that "Children's [Hospital] and the county remained in constant contact, relied on each other for keeping [the minor] at the

hospital, and at various times gave the [parents] conflicting statements about who would make the ultimate decision to discharge [the minor]." *Id.* at 760. The Sixth Circuit found that the plaintiffs had alleged "a deep and symbiotic relationship between Children's [Hospital] and the county." *Id.* On the other hand, the Sixth Circuit cautioned that "hospitals and doctors do not become state actors merely because they comply with state statutes." *Id.*

Plaintiffs here have not pleaded sufficient facts to state a plausible claim that the TriHealth Defendants, Sakhi, or Necco acted in concert with the Hamilton County Defendants under the *Siefert* standard. The key distinguishing fact is that the plaintiffs in *Siefert* allege nearly a month of concerted action between the hospital and the county. *Id*. at 764. Here, Plaintiffs offer mostly conclusory allegations about a single visit to the BFPC medical office. "It is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983." *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) (citation omitted); *see also Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 563–564 (6th Cir. 2011) (same quote).

Significantly, Plaintiffs do not specifically allege that any of the TriHealth physicians—Dr. Stephens, Dr. Okragly, or Dr. Steffenmeier—were present at the medical office on September 3, 2020. Plaintiffs do not allege that any of them had direct communication with any of the Hamilton County Defendants about the Leta children's appointment prior to or during the appointment. Plaintiffs do not allege that any of the physicians directed or approved of the decision to exclude the Letas and Weil from the medical examination room during the Leta children's appointment. Nor do they allege that any of the physicians directed or approved of the decision to call the Norwood police officers. Dr. Stephens, Dr. Okragly, or Dr. Steffenmeier

16

simply cannot be held to have conspired or acted in joint concert with any state actor to have denied the Letas access to their children's medical care.

The only specific allegation of communication between any state actor and any TriHealth Defendant is the allegation that the JFS caseworker Brown directed "Defendants TriHealth/BFPC/Zimmer" to call for police intervention. A single conversation about the decision to call the police, presumably following the disturbance in the waiting room between Nicole Leta and Sakhi's teenage daughter, does not give rise to a finding a joint action or plan between the Hamilton County Defendants and the TriHealth Defendants to deny the Letas access to their children's medical care.

Finally, Plaintiffs do not allege that foster caregiver Sakhi or foster agency Necco communicated with the JFS employees about having the children vaccinated at the September 3, 2020 appointment. They do not allege that either Sakhi nor anyone from Necco prevented the Letas from going to the exam room at BFPC with their children, nor do they allege that Sakhi or Necco were involved in the decision to call the police. Moreover, the mere fact that Necco is an agency that contracts with the state to provide child foster services is not sufficient to create state actor status. *See Howell v. Father Maloney's Boys' Haven, Inc.*, 976 F.3d 750, 753 (6th Cir. 2020) ("Across the country, there's near uniformity that foster homes do not count as state actors."). Therefore, Sakhi and Necco cannot be held liable for denying Letas' access to the children's medical care under the color of state law.

As to Plaintiffs' allegation of "joint participation and coordination" between Hamilton County Defendants and the non-governmental Defendants to vaccinate the children, the allegation is conclusory and insufficient. (Doc. 7 at PageID 37.) Plaintiffs admit in the Amended Complaint that it "is not clear" on whose consent the TriHealth Defendants relied to

vaccinate the children and that "discovery will be required to determined [*sic*] what happened that day." (*Id.* at PageID 39.)  The only consent on record for the vaccinations is a consent for treatment signed by Sakhi six months earlier in March 2020.  (*Id.*)  A joint decision by the TriHealth Defendants and Sakhi—all private individuals or entities—to vaccinate the children would not be action taken under the color of state law for purposes of § 1983.  Again, there are no non-conclusory allegations that any of the TriHealth Defendants discussed with any of the Hamilton County Defendants prior to or during the September 3, 2020 medical appointments the decision to vaccinate the children that day.  For all of these reasons, this case is readily distinguishable from *Siefert* and none of the non-governmental actors can be held liable for actions taken under the color of state law.

### 3.    Conclusion

The Court will dismiss the medical access and medical control claims against all Defendants.

### B.    Claim for Violation of Religious Rights

The Letas also allege that Defendants violated their right to free exercise of religion when they vaccinated two Leta children without the Letas' consent.  (Doc. 7 at PageID 42–43.)  A plaintiff cannot establish a claim for violation of the free exercise of religious rights without first establishing that (1) "the belief or practice asserted is religious in the person's own scheme of things" and (2) the belief "is sincerely held."  *Kent v. Johnson*, 821 F.2d 1220, 1224 (6th Cir. 1987).

The Letas' claim here is deficient as a matter of law.  The Letas do not allege any facts explaining the nature of their religious beliefs, whether the beliefs are sincerely held, or in what respect the vaccination of children conflicts with those religious beliefs.  The Letas also do not

allege a factual basis for the Court to infer that Defendants knew they withheld consent for vaccinations based on religious beliefs.  A person's opposition to immunizations could be based on a host of scientific, religious, or personal beliefs.  Plaintiffs allege only that foster caregiver Sakhi informed the treating physician in March 2020 that Nicole Leta did not consent to vaccinations.  (Doc. 7 at PageID 39.)  Without more, the Letas have not stated a claim for violation of their religious beliefs upon which relief can be granted.

Additionally, Plaintiffs admit that they have found a "low level of support . . . in case law regarding federal constitutional protection for rights of parents objecting on religious grounds to the immunization/vaccination of children." (Doc. 20 at PageID 257.)  Rather, as mentioned earlier, the Sixth Circuit stated in 2017 that parents had no constitutional right to exempt their children from Michigan's mandatory vaccination program.  *Nikolao*, 875 F.3d at 316.  Certainly, the right of non-custodial parents to withhold consent for the vaccination of their children for religious reasons was not well established in September 2020.  Therefore, the individual Defendants are entitled to qualified immunity on this claim as well.  Finally, as explained in the previous section on the control of medical care claim, the TriHealth Defendants, Sakhi, and Necco cannot be held liable under § 1983 for actions taken under the color of state law as to the decision to vaccinate the children.

For all of these reasons, the Court will dismiss the Letas' free exercise of religion claim.

**C.    Claim for Unreasonable Seizure in Violation of Fourth Amendment**

**1.    Legal Overview of the Claim**

Finally, the Letas and Weil assert that they were unreasonably seized in violation of the Fourth Amendment when Defendants "invoke[d] police intervention during the 09/03/20 medical appointment." (Doc. 7 at PageID 43.)  The Supreme Court has held that "whenever a police

officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). "A seizure can occur in one of two ways: (1) use of force with the intent to restrain; or (2) show of authority with acquisition of control." *Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468, 476 (6th Cir. 2022). Usually, the test for if a seizure has occurred is whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468, 476–477 (6th Cir. 2022) (citation omitted). In this case, however, the Letas and Weil argue they were seized because they were escorted out of the medical office and were not free to remain there. *See Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 263 (6th Cir. 2015) (Boggs, J. concurring) (stating that street preachers commanded to leave a public event or face arrest were seized). The parties dispute whether the facts alleged here amount to a seizure.

In 2005, the Sixth Circuit opined that "Fourth Amendment jurisprudence suggests a person is seized not only when a reasonable person would not feel free to leave an encounter with police, but also when a reasonable person would not feel free to *remain* somewhere, by virtue of some official action." *Bennett v. City of Eastpointe*, 410 F.3d 810, 834 (6th Cir. 2005) (emphasis in the original). The plaintiff in *Bennett* alleged that police officers from the City of Eastpointe escorted him back to the boundary line between Eastpoint and Detroit and then watched to make sure that he crossed the boundary back into Detroit. *Id.* In a more recent case, however, the Sixth Circuit stated that a protester whose repeated questions in violation of established rules contributed to a disturbance at a public meeting on public property was not seized when she was ejected from the meeting. *Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 523 (6th Cir. 2019). Relevant factors to consider after *Youkhanna* include whether force

was used, whether the person had "lost the privilege to remain in the [public] space" based on his or her behavior, and whether the person otherwise was free to go where he or she wanted.  *Id.*

Plaintiffs have not identified any Sixth Circuit or Supreme Court case holding that officers seized an individual for purposes of the Fourth Amendment when they escort him or her from private property, without the use of force, and do not otherwise restrain the individual's freedom.  Here, Plaintiffs allege that JFS caseworker Brown gave a "directive to TriHealth/BFPC/Zimmer to call the police to remove [the Letas]."  (*Id.* at PageID 36.)  Plaintiffs have not sued the City of Norwood nor the Norwood police officers who escorted the Letas and Weil from the BFPC medical office.  Plaintiffs do not allege that the Norwood police officers acted in joint concert with any named Defendants to violate Plaintiffs' rights.  Nor do they allege that the police officers used force or explicitly threatened the Letas or Weil with arrest.  Instead, they allege only that the officers told Plaintiffs that they had to leave the building, that the Plaintiffs were calm and cooperative, and that the officers then "escorted [Plaintiffs] out of the building."  (*Id.* at PageID 36–37.)  Plaintiffs do not allege that the officers restricted Plaintiffs' movement in any other way other than making them leave the medical office.  The Court finds as a matter of law under the *Youkhanna* precedent that Plaintiffs have failed to state a claim that they were seized for purposes of the Fourth Amendment.

Case law from other Circuit Courts of Appeal also suggests that Plaintiffs were not seized even if the Norwood police required them to leave the BFPC building.  *See Peery v. City of Miami*, 977 F.3d 1061, 1071 (11th Cir. 2020) ("The key question is whether a reasonable person can "terminate the encounter" with police.  A person who is told to leave one place but 'remains free to go anywhere else that he wishes' can undoubtedly terminate his encounter.") (internal citation omitted); *Laverdi v. Jenkins Twp.*, 49 F. App'x 362, 364 (3d Cir. 2002) ("Although

[plaintiff] was escorted from the [public] meeting, he left freely and was never touched by the police officer[,] a far cry from a full-scale arrest. Under these circumstances, the District Court did not err in holding that [plaintiff's] Fourth Amendment rights were not violated."); *Sheppard v. Beerman*, 18 F.3d 147, 153 (2d Cir. 1994) (finding no seizure where a law clerk was escorted out of chambers and the courthouse, but otherwise free to go anywhere else).  On the basis of *Youkhanna* and the case law from other Circuits, the Court holds that Plaintiffs have failed to state a claim upon which relief can be granted that the Norwood police officers seized them in violation of the Fourth Amendment.

### 2.    No Defendants Are Liable

Even if the Court were to hold that the Norwood police officer seized Plaintiffs when they escorted them from the BFPC medical building, none of the named Defendants can be held liable for that seizure.  The primary allegation is that JFS caseworker Brown directed TriHealth/BFPC/Zimmer to call the police to remove Parents and that she did so under the approval of her supervisors "Fleckenstein and/or Webster."  (Doc. 7 at PageID 36, 41.)  The JFS employees cannot be held liable under these allegations as persons who caused the violation of Plaintiffs' Fourth Amendment rights even if their removal from the medical office had been a seizure.  The JFS employees had no authority to require any TriHealth Defendant to call the police.  Nor did they have authority to require Norwood police officer to remove or escort Plaintiffs from the medical office premises.  Plaintiffs did not allege that JFS employees or TriHealth Defendants acted in concert with the Norwood police.  The JFS employees simply cannot be held liable for the actions of the Norwood police officers two steps removed from Brown's "directive . . . to call the police to remove Parents."[13]

---

[13]  This conclusion is consistent with caselaw holding that individuals who report crimes or call the police for assistance generally cannot be held liable for violation of an arrestee's constitutional rights.  *See*, *e.g.*, *Moldowan v.*

Nor has Plaintiff pleaded sufficient facts to establish *Monell* liability against Hamilton County for the seizure.  Plaintiffs have not pleaded facts supporting an inference that Hamilton County has a policy to use police officers to exclude parents from medical appointments for children placed in foster care.  Plaintiffs allege only that JFS caseworkers and supervisors have final decisionmaking authority for "day-to-day communications with medical providers."  (Doc. 7 at PageID 41.)  However, instructing medical providers to call for police intervention would not fall into a category of "day-to-day communications with medical providers."

As to the TriHealth Defendants, only TriHealth, BFPC, and/or practice manager Zimmer are alleged to have communicated with JFS caseworker Brown and called the Norwood police. (*Id.* at PageID 36.)  This single communication with a state actor, Brown, is not sufficient under the *Siefert* standard to hold these TriHealth Defendants liable for acting under the color of state law, particularly since it was the Norwood police officers, not Brown, who escorted Plaintiffs from the premises.  Again, Plaintiffs did not sue the Norwood police officers nor allege that any named Defendants acted in concert with them.

Finally, Plaintiffs do not allege that the TriHealth physicians, foster caregiver Sakhi, nor foster agency Necco played any role in calling for police intervention.

### 3.    Conclusion

Based on this analysis, the Court will dismiss Plaintiffs' seizure claim.

## IV.    CONCLUSION

For the foregoing reasons, the Hamilton County Defendants' Motion to Dismiss (Doc. 11) is **GRANTED**, Defendant Necco's Motion to Dismiss (Doc. 12) is **GRANTED**, the

---

*City of Warren*, 578 F.3d 351, 399 (6th Cir. 2009) ("Providing information to the police . . . does not expose a private individual to liability for actions taken under color of law."); *Parker v. Grand Hyatt Hotel*, 124 F. Supp. 2d 79, 88 (D.D.C. 2000) (calling the police for assistance does not establish joint action for the police); *Fisk v. Letterman*, 401 F. Supp. 2d 362, 367 (S.D.N.Y. 2005) (stating that "a private party who calls police officers for assistance" cannot be held liable under § 1983 "unless the police officers were improperly influenced or controlled by the private party").

TriHealth Defendants' Motion to Dismiss (Doc. 13) is **GRANTED**, and Defendant Sakhi's

Motion to Dismiss (Doc. 14) is **GRANTED**.  Additionally, Defendants' Joint Motion for

Protective Order Staying Discovery (Doc. 25) is **DENIED AS MOOT**.

       **IT IS SO ORDERED.**

                  BY THE COURT:


                  S/Susan J. Dlott
                  Susan J. Dlott
                  United States District Judge